**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ARMADA CONCRETE, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> JAYNES CORPORATION; WESTERN SURETY COMPANY, <br><br> Defendants. | Case No.: 2:14-cv-02176-GMN-GWF <br><br> **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| JAYNES CORPORATION, <br><br> Third-Party Plaintiff, <br><br> vs. <br><br> LIBERTY MUTUAL INSURANCE COMPANY, <br><br> Third-Party Defendant. | |
| JAYNES CORPORATION, <br><br> Counter Claimant, <br><br> vs. <br><br> ARMADA CONCRETE, LLC, <br><br> Counter Defendant. | |

Beginning on May 15, 2017, the Court conducted a ten-day bench trial relative to the dispute between Plaintiff Armada Concrete, LLC, and Third-Party Defendant Liberty Mutual

Insurance Company ("Liberty Mutual")[1] (collectively "Armada") and Defendants Jaynes Corporation and Western Surety Company ("WSC")[2] (collectively "Jaynes").

On December 22, 2014, Armada filed its Complaint, (ECF No. 1), asserting the following causes of action against Jaynes: (1) recovery on its Miller Act bond; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; and (4) quantum meruit/unjust enrichment. Shortly thereafter, on January 30, 2015, Jaynes filed a Third Party Complaint, (ECF No. 10), against Liberty Mutual for payment on its bond. That same day, Jaynes filed a Counter Claim, (ECF No. 11), against Armada, asserting the following claims: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) payment on the bond.

Having reviewed each of the motions, related briefs, exhibits thereto, and having considered the oral argument of each of the parties, the Court hereby makes the following findings of fact and conclusions of law.

### I. **FINDINGS OF FACT**[3]

1. On or about June 20, 2011, the United States Army Corps of Engineers issued a Solicitation, Offer and Award to Jaynes Corporation (the "Prime Contract") as the design build contractor for construction of the Fire Crash Rescue Station at Creech Air Force Base (the "Project"). (*See generally* Ex. 61).

2. The United States Army Corps of Engineers (the "Corps," "Government," or "Owner") is the Owner of the Project. (*Id.*).

---

[1] Liberty Mutual Insurance Company is Armada's bonding company. (*See* Ex. 60.587–.590).

[2] Western Surety Company is Jaynes' bonding company. (*See* Ex. 491.1).

[3] To the extent any Finding of Fact should be properly designated a Conclusion of Law, it shall be deemed a Conclusion of Law. To the extent any Conclusion of Law should properly be designated a Finding of Fact, it shall be deemed a Finding of Fact.

3. On September 5, 2012, Armada submitted its Proposal to Jaynes to complete certain concrete installations for the Project. (*See* Exs. 304.10–13).

4. On September 21, 2012, the parties met and held a pre-construction meeting. (*See* Ex. 304.2–.4).

5. During that meeting, Jaynes' estimator completed his pre-construction notes which included a marked up copy of Armada's Proposal and Jaynes' Vendor Scope Checklist. (*Id.*). Both of these documents constitute Pre-Construction Meeting Notes. (*See* Trial Tr. Crampton 122:17–19, 135:18–23, ECF No. 124).

6. The Proposal excludes all testing of Armada's work and provides that Armada was "[n]ot responsible for drainage problems on flatwork designed with 1% or less of fall." (Ex. 304.12); (*see also* Ex. 304.7); (Trial Tr. Crampton 109:14, 111:9–15, ECF No. 124).

7. Pursuant to the Vendor Scope Checklist, Armada agreed to cover cold weather costs associated with the Project. (Ex. 304.9); (*see also* Trial Tr. Crampton 15:21–24, ECF No. 126).

8. On September 24, 2012, Jaynes and Armada entered into the Standard Subcontract Agreement for Use On Federal Government Construction Projects (the "Subcontract"). (*See* Ex. 501).

9. Exhibit A to the Subcontract Agreement incorporates the parties' Pre-Construction Meeting Notes as part of the Subcontract Agreement. (*See* Ex. 510.033).

10. Pursuant to the Subcontract, Armada agreed to install the slab-on-grade in Area A and Area B of the Project. (*See* Exs. 510.40–45; 36.2).

11. Armada also agreed to complete the following work: provide sloped slabs as indicated on plans; provide layout and equipment as necessary to complete the saw-cutting of required control joints; and place Type II for the building slab upon following laying of underground utilities by other subcontractors. (*See id.*).

12. Jaynes was the design-build general contractor for the Project, and as a design-build contractor was responsible for the design and engineering of the Project, including the design and engineering of the Area B slab-on-grade. (Trial Tr. Crampton 77:4–7, ECF No. 1).

13. Jaynes retained Wright Engineers and Dekker Perich Sabatini Architects to prepare designs and plans for construction of the Project. (Trial Tr. Brooke 124:5–11, ECF No. 130).

14. The Subcontract documents as defined by the Subcontract are: the Subcontract; the Prime Contract; change orders and written amendments; drawings, specifications, and addenda; general and other conditions; approved submittals; the prime contract; and Federal Acquisition Regulations ("FARs") (collectively the "Contract Documents"). (Ex. 510.033); (*see also* Trial Tr. Crampton 15:17–20, ECF No. 126).

15. The original amount of the Subcontract was $397,413.00. (Ex. 510.014).

16. During the Project, Jaynes issued three change orders to Armada for additional work which increased the Subcontract amount to $441,255.26. (Exs. 116–18).

17. To date, Jaynes has paid Armada $316,075.41. (*See* Trial Tr. Gundrum 213:20–21, 213:25–214:4, ECF No. 214).

18. Armada began its work on a 4-day workweek, which later changed to a 5-day workweek. (Trial Tr. Crampton 111:2–6, 151:20–25, ECF No. 124; Trial Tr. Brooke 72:20–21, ECF No. 130); (*see also* 444.1–.13).

19. In accordance with Jaynes' September 12, 2012 Project Baseline Schedule, which Armada based it price for the work upon, Armada was to commence its work on October 8, 2012, and was to complete its work on approximately March 21, 2013. (Ex. 510.63–.83); (Trial Tr. Crampton 130:1–3, ECF No. 124; Trial Tr. Gundrum 102:21–25, ECF No. 142; Trial Tr. Eiman 36:1–3, ECF No. 133). According to the Project Baseline Schedule, therefore, Armada's total project duration was 144 days. (*See* Ex. 510.63–.83).

20. Armada was not able to begin its work until November 5, 2012, due to delays Jaynes suffered on the project totally unrelated to Armada's performance. (Trial Tr. Crampton 136:7–17, ECF No. 124; Trial Tr. Gundrum 132:20–133:1, ECF No. 126; Trial Tr. Brooke 52:2–17, ECF No. 131).

21. Jaynes' project supervisor acknowledged that Armada had not delayed the schedule, "if anything Armada [did] a lot to help with the schedule." (Ex. 60.210); (Trial Tr. Crampton 72:6–8, ECF No. 125).

22. The Project schedule was updated and revised to reflect the delays. (Trial Tr. Brooke 159:17–20, ECF No. 130); (*see* Ex. 302).

23. The initial delay Jaynes experienced on the project prior to Armada's commencement of work not anticipated by the parties when they entered into the Subcontract agreement. (Trail Tr. Crampton 104:11–24, ECF No. 124). The cold weather caused Armada to incur cold weather costs it would not have incurred but for the delay and caused Armada's crew to work less efficiently. (Trial Tr. Crampton 32:20–25, ECF No. 125).

24. Since Armada's work was delayed into the colder months, Jaynes directed Armada to provide it with a "cold weather plan" for placing the concrete in such inclement weather. (Exs. 38; 60.168–.169); (Trial Tr. Crampton 139:8–16, ECF No. 124).

25. Armada's cold weather plan detailed three levels of responses depending on the degree of cold weather. (Ex. 60.168–.169). Armada anticipated a Level I response, requiring application of minimum insulation to the slab like hay. (Trial Tr. Crampton 142:17–20, 147:18–20, ECF No. 124).

26. Jaynes also directed Armada to provide a lighting plan to permit work during the shorter day-lengths. (Ex. 6.2); (Trial Tr. Crampton 154:8–14, ECF No. 124). Armada did not anticipate these costs as the baseline schedule called for its work to be completed during these months. (Trial Tr. Crampton 154:20–155:10, ECF No. 124).

27. On November 29, 2012, Armada notified Jaynes in accordance with Subcontract § 5.3 that it was suffering delays for which it would seek compensation and an extension of time. (*Id.* 156:17–25); (Ex. 2). The Notice identified delays caused by other subcontractors, "caus[ing] extended cold weathering procedures on [Armada's] concrete operations that were not anticipated in the schedule that was included as part of the contract." (Ex. 2). The Notice further provided that Armada would substantiate the costs it was experiencing as a consequence of the delay once such costs were determined. (*Id.*).

28. As an ongoing delay, it would have been impossible for Armada to provide substantiation of its delay claim until such costs were fully known. (Trial Tr. Brooke 148:1–7, ECF No. 130; Trial Tr. Crampton 161:5–9, ECF No. 124).

29. To substantiate its claim for delay and impact damages, Armada retained SDC & Associates Inc. ("SDC"), a construction claims firm, to compile and substantiate Armada's claim for Jaynes and the COE. (*See generally* Ex. 60); (Trial Tr. Crampton 147:24–148:1). Armada later retained SDC & Associates to compile a claim related to the Area B slab. (*See* Ex. 60).

30. Armada submitted its claim for equitable adjustment to Jaynes on June 12, 2014. (Trial Tr. Crampton 17:11–21, ECF No. 127).

31. Armada acknowledged that the schedule delays were "not an increase in the scope of work" because Armada was "still building the same project." (Tr. Transcript Crampton 124:25–125:12, ECF No. 125); (*see also id.* 127:18–20).

32. On January 18, 2013, Jaynes issued a revised project schedule which showed the project delayed by 44 days. (Ex. 60.180).

33. As a consequence of the initial delay suffered by Jaynes, Armada was ordered by Jaynes to complete its work out of the planned sequence of work and in an accelerated manner which increased the costs incurred by Armada to complete its work. (*See id.*).

34. On January 29, 2013, Armada again notified Jaynes in writing that it was suffering delay and disruption costs from Jaynes' subcontractors working out of the project scheduled sequence. (Ex. 60.184). Armada through this notification advised Jaynes that it would submit its claim for increased costs to Jaynes once such cost could be established. (*Id.*).

35. The out of sequence work prevented Armada from completing its work on the project as scheduled. (Trial Tr. Crampton 18:11–19:21, ECF No. 125).

36. On January 31, 2013, the project teams for Armada and Jaynes met to discuss scheduling and other project issues. (*See* Ex. 60.185). At that meeting, Armada informed Jaynes that the 0.5% slope demanded by the COE was insufficient to drain the slab and reminded Jaynes that Armada was not responsible for drainage of any slab designed with less than 1% slope. (Trial Tr. Crampton 26:11–23, 28:10–29:23, ECF No. 125). Armada also advised Jaynes that its most recent project schedule did not reflect the progress made at the site and was inaccurate. (*Id.* 27:8–28:9).

37. On February 14, 2013, Jaynes advised Armada that the placement of the Area B slab would be delayed so that Jaynes could accelerate the work of its masonry subcontractor. (Ex. 60.195).

38. As a consequence of Jaynes' direction to wait on the installation of the slabs-on-grade in Area A and Area B, Armada lost its ability to obtain concrete from its suppler as planned and instead had to compete with other projects for concrete availability. (Ex. 60.201, .211); (Trial Tr. Crumpler 62:18–64:22, ECF No. 125).

39. As a consequence of Jaynes directing its masonry subcontractor to work out of sequence and to install the wall around Area B before the installation of the slab was completed, the installation of the slab became much more difficult. (Trial Tr. Crampton 10:20–23, ECF No. 125).

40. For example, Armada points out that the presence of the masonry walls required Armada to use a concrete pump to pour the concrete in Area B. (Trial Tr. Crampton 62:4–13, ECF No. 127; Trial Tr. Crumpler 182:1–4, ECF No. 127). Nevertheless, Armada's pour plan always called for use of a concrete pump in Area B. (*Id.* 63:13–64:4).

41. The Contract Documents require saw cutting to be performed timely and within the same day as pouring the slab-on-grade. (*See* Ex. 406.1); (*see also* Exs. 35.25; 172); (Trial Tr. Crampton 53:12–13, ECF No. 125).

42. In response to Armada's slab-on-grade Placement Plan, the Corps responded: "Placement, finish and control joint saw cuts must be completed same day." (Ex. 406.1).

43. Specifications Section 03 31 00.00 10, Cast-In-Place Structural Concrete, § 3.6.2 states: "For saw-cut joints, cutting shall be timed properly with the set of the concrete. Cutting shall be started as soon as the concrete has hardened sufficiently to prevent raveling of the edges of the saw cut. Cutting shall be completed before shrinkage stresses become sufficient to produce cracking." (Ex. 35.25).

44. Drawing S-501, n. 10 states: "Saw cut shall be made w/ early entry saw soon enough to prevent shrinkage cracking, but not so soon as to cause spalling." (Ex. 172).

45. After learning that Armada intended to saw cut the slab-on-grade the day after it poured and finished the slab-on-grade, the Corps stated: "We understand that it is convenient to saw cut the concrete the following morning, but allowing too much time being [sic] placement and saw cutting could result in excessive shrinkage cracking to the slab. The saw cuts are there to alleviate pressure forming with the concrete, allowing too much time to pass uncontrollable crack however it so pleases." (Ex. 306.3).

46. Armada placed the entire Area B slab-on-grade on March 14, 2013. (Trial Tr. Crampton 91:20–22, ECF No. 125). Saw cutting did not begin until the morning of Friday, March 15, 2013. (Ex. 56); (Trial Tr. Crumpler 185:10–12, ECF No. 127).

47. On March 15, 2013, Jaynes advised Armada that cracks were appearing in the Area B slab-on-grade and instructed Armada to wet and cover the slab. (Ex. 14); (Trial Tr. Crampton 88:24–89:1).

48. It is not industry standard for slab-on-grade specifications to allow for cracking. (Trial Tr. Gervasio 12:2–18, ECF No. 126).

49. The Subcontract requires that "[w]ork quality is to be the highest priority. Substandard work will be removed by the Subcontractor, and replaced at the sole expense of Subcontractor." (Ex. 510.036).

50. Armada failed to provide a slab-on-grade that was acceptable to the Corps, and the Corps determined that the cracking was unacceptable and could not be appropriately repaired. (Exs. 21.1–.3).

51. Armada knew that saw cuts were to be made using an early-entry soff cut saw. (Ex. 304.11).

52. Generally, early-entry dry-cut saw cuts should be made within one to four hours after completing the finishing of the slab in the joint location at issue. (Trial Tr. Gervasio 224:20–225:2, ECF No. 133); (Ex. 47). "For early-entry dry-cut saws, the waiting period will typically vary from 1 h in hot weather to 4 h in cold weather after completing the finishing of the slab in that joint location." (Ex. 47).

53. Specifications Section 03 31 00.00 10, Cast-In-Place Structural Concrete, § 3.6.2 states, in part: "Cutting shall be completed before shrinkage stresses become sufficient to produce cracking." (Ex. 35.25).

54. Jaynes' examination of the slab-on-grade evidenced that the concrete was sufficiently cured to begin saw cutting on March 14, 2013. (Trial Tr. Purington 129:19–130:3, ECF No. 132).

55. When Jaynes arrived on-site the morning of Friday, March 15, 2013, numerous cracks had already formed and appeared on the slab-on-grade, before Armada began any saw cuts. (Exs. 14; 666–672); (*see* Trial Tr. Crumpler 36:8–11, ECF No. 131; Trial Tr. Purington 168:22–24, ECF No. 132). On June 6, 2013, Armada acknowledged that at least some cracks were outside acceptable tolerances. (Ex. 310.2); (Trial Tr. Crampton 53:3–6, ECF No. 127).

56. The Corps determined that the unacceptable cracking was in part because "saw cutting was required to be accomplished by early-entry saw cuts within 2 to 3 hours following finishing in each area as the placement progressed per ACI 360R. This was not done . . . The specifications, drawing detail, and codes were not adhered to." (Ex. 21.1).

57. Accordingly, Armada failed to comply with the Contract Documents and the Specifications Section 03 31 00.00 10, Cast-In-Place Structural Concrete, § 3.6.2 which required saw cuts "be completed before shrinkage stresses became sufficient to produce cracking." (Ex. 35.25); (*see also* Exs. 406.1; 172; 304.11).

58. The failure to properly and timely install the required saw cut joints per contract requirements caused the unacceptable cracking. (*See* Ex. 503); (Trial Tr. Brooke 177:14–178:5, ECF No. 131).

59. A lack of expansion joints would not cause cracking. (Trial Tr. Gervasio 20:19–22, ECF No. 126).

60. The Corps rejected the Area B slab-on-grade, primarily due to the cracks in the slab. (Ex. 21.1–.3); (Trial Tr. Brooke 110:24–25, ECF No. 110).

61. The Corps rejected Jaynes' and Armada's proposed remedies to the cracks, namely, an epoxy coating. (Trial Tr. Brooke 110:25–111:24, 121:20–21, ECF No. 130); (Ex. 453.159). The end user, the Creech Air Force Base Fire Station, determined that an epoxy coating required "a higher level of maintenance" to "keep [the] finish pristine" and "present[ed]

more problems that a straight concrete floor." (Ex. 338.1). In addition, an epoxy coating failed to provide the desired aesthetic of an exposed concrete floor. (*Id.*).

62. Accordingly, the Corps directed Jaynes to remove and replace the Area B slab-on-grade. (Ex. 21.1–.3); (Trial Tr. Brooke 109:10–111:4, ECF No. 130).

63. Pursuant to the Corps' directive, Jaynes was compelled to instruct Armada to remove and replace the Area B slab-on-grade at its own cost and expense. (Trial Tr. Brooke 108:24–109:5, ECF No. 130).

64. Jaynes notified Armada it was in breach of the Subcontract because its work was deemed defective by Owner and required removal and replacement. (Exs. 16, 21); (Trial Tr. Brooke 123:18–21, ECF No. 130).

65. Armada refused to remove and replace the Area B slab-on-grade at its own cost and expense. (*See* Ex. 311.2 –.5); (Trial Tr. Brooke 127:25–128:7, ECF No. 130).

66. On March 25, 2013, Jaynes provided Armada 72-hour Notice to Cure what Jaynes contended were deficiencies in the Area B slab-on-grade. (Ex. 16).

67. On March 25, 2013, Armada transmitted a letter to Jaynes providing a summary of its position on the flaws in the Area B slab-on-grade. (*See* Ex. 15). Armada claimed the cracking, ponding and lack of drainage of the slab was the consequence of design flaws and Jaynes' directive to Armada to deviate from the plans. (*Id.*).

68. Jaynes retained a new subcontractor to remove and replace the Area B slab-on-grade, WGDL. (Trial Tr. Brooke 128:17–20, ECF No. 130).

69. Jaynes paid its new subcontractor, WGDL, $287,997.17 to remove and replace Armada's rejected slab. (Trial Tr. Brooke 128:21–132:1); (*See, e.g.*, Exs. 4, 33, 101, 134).

70. Section 52.246-12(f) of the Prime Contract states: "The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract

requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price." (Ex. 61.311).

71. The Prime Contract states that:

> (f) The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price. The Contractor shall promptly segregate and remove rejected material from the premise.
>
> (g) If the Contractor does not promptly replace or correct rejected work, the Government may (1) by contract or otherwise, replace and correct the work and charge the cost to the Contractor or (2) terminate for default the Contractor's right to proceed.

(*Id.*).

72. Section 10.1 of the Subcontract, identified as "Failure of Performance," states:

> If the Subcontractor refuses or fails to supply enough properly qualified workers, proper materials, or maintain the Project Schedule . . . or otherwise is guilty of a material breach of a provision of this Agreement, the Subcontractor shall be deemed in default of this Agreement. If the Subcontractor fails within three (3) business Days after written notification to commence and continue satisfactory correction of the default with diligence and promptness, then the Contractor without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies:
>
> 10.1.1.1 supply workers, materials, equipment and facilities as the Contractor deems necessary for the completion of the Subcontract Work or any part which the Subcontractor has failed to complete or perform after written notification, and charge the cost, including reasonable overhead, profit, attorneys' fees, costs and expenses to the Subcontractor;
>
> 10.1.1.2 contract with one or more additional contractors to perform such part of the Subcontract Work as the Contractor determines will provide the most expeditious completion of the Work, and charge the cost to the Subcontractor as provided under Clause 10.1.1.1; or

> 10.1.1.3 withhold any payments due or to become due the Subcontractor pending corrective action in amounts sufficient to cover losses and compel performance to the extent required by and to the satisfaction of the Contractor. In the event of an emergency affecting the safety of persons or property, the Contractor may proceed as above without notice, but the Contractor shall give the Subcontractor notice promptly after the fact as a precondition of cost recovery.

(Ex. 34.25).

## II. CONCLUSIONS OF LAW

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

2. The parties must prove their claims and affirmative defenses by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) (providing that preponderance of-the-evidence is the default standard in civil litigation between private litigants); *accord Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1245 (D. Nev. 2016). Showing something by a preponderance of the evidence "'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (quoting *In re Winship*, 397 U.S. 358, 371–372 (1970) (brackets in original)).

3. Because the law makes no distinction between direct and circumstantial evidence, all evidence, including circumstantial evidence, should be considered. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (holding that direct and circumstantial evidence should be given equal weight); *accord Rodella v. United States*, 286 F.2d 306, 312 n.4 (9th Cir. 1960); *see also Manual of Model Jury Instructions for the Dist. Courts of the Ninth Circuit*, 1.12 (Mar. 2017).

4. To succeed on a claim for breach of contract a party must show: (1) the existence of a valid contract; (2) that the party performed or was excused from performance; (3) that the

opposing party breached the terms of the contract; and (4) that the party was damaged as a result of the breach. *See Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000) ("A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement").

5. In Nevada, an implied covenant of good faith and fair dealing exists in every contract. *A.C. Shaw Const., Inc. v. Washoe County*, 784 P.2d 9, 9 (Nev. 1989). Where breach of the implied covenant of good faith and fair dealing is alleged, a plaintiff may claim damages under a contract theory and/or a tort theory. *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 862 P.2d 1207, 1209 (Nev. 1993). Under a contract theory, a plaintiff may assert a claim where "the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract." *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991).

6. Generally, the remedy for a breach of the implied covenant of good faith and fair dealing is limited to contractual remedies. *Mundy v. Household Fin. Corp.*, 885 F.2d 542, 544 (9th Cir. 1989); *see also Nev. Power Co. v. Calpine Corp.*, No. CV-S-04-1526-PMP-PAL, 2006 WL 1582101, at *9 (D. Nev. June 1, 2006) ("As a contract concept, breach of duty leads to the imposition of contract damages determined by the nature of the breach and contract principles.").

7. On or about September 24, 2012, the parties entered into a valid and existing contract. (*See generally* Ex. 510).

8. Because a valid, written agreement between the parties exists, Armada's claim for unjust enrichment is unavailable. *See Leasepartners Corp. v. Robert L. Brooks Trust*, 942 P.2d 182, 187 (Nev. 1997) ("An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement.").

9.  Further, the Court finds, assuming *arguendo* that Armada properly pled cardinal change doctrine, the project delays, out of sequence work, and increased costs fail to amount to a cardinal change in the Subcontract Agreement. *See J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1020 (Nev. 2004) ("[A] cardinal change occurs when the work is so drastically altered that the contractor effectively performs duties that are materially different from those for which the contractor originally bargained."); (Tr. Transcript Crampton 124:25–125:12, 127:18–20, ECF No. 125).

10.  Accordingly, Armada's claim for unjust enrichment is dismissed.

11.  The Court concludes that the Pre-Construction Meeting Notes, which consist of Jaynes' Vendor Scope Checklist and Armada's Proposal, are part of the Subcontract between the parties pursuant to Exhibit A of the Subcontract. (Ex. 510.34).

12.  Section 5.1 of the Subcontract states: "Time is of the essence for both Parties. They mutually agree to see to the performance of their respective obligations so th.at the entire Project may be completed in accordance with the Subcontract Documents and particularly the Progress Schedule." (Ex. 510.13).

13.  Pursuant to the Subcontract, Jaynes owed Armada a duty of good faith and fair dealing. (*See generally* Ex. 510).

14.  The evidence establishes Jaynes caused 188 days of delay to Armada's work on the Project. This delay constitutes a breach of the Subcontract and a breach of the implied covenant of good faith and fair dealing. (*See* Ex. 510.13).

15.  Armada's initial notices of delay damages were timely and sufficient under Article 5 of the Subcontract. In light of the complexity of such claims and the difficulty in providing substantiation until the end of the project, Armada's tender to Jaynes of its detailed claim for Equitable Adjustment compiled by SDC was timely under Article 5 of the Subcontract.

16. The damages sought by Armada as testified to by its expert are not consequential damages and are allowed under Article 5 of the Subcontract. (*See* Ex. 510.014).

17. As a consequence of the delays experience at the project and Jaynes' efforts to mitigate the delays, the placement of the Area A slab could not be completed until March 13, 2013. (*See* Ex. 60.218). Because the weather was cold during that period, Armada was instructed to place the slab in three pours rather than the single pour it planned in its original placement plan. (Trial Tr. Eiman 36:13–37:22, ECF No. 133). Armada is entitled to the additional $3,530.00 in costs it incurred due to additional equipment rentals required to place the slab two additional days (*See* Ex. 60.739–.742).

18. As a consequence of the delays experience at the project and Jaynes' efforts to mitigate the delays, Armada incurred $9,665.05 in cold weather protection costs it would not have incurred but for the delays. (Ex. 60.748–.757); (Trial Tr. Eiman 41:2–49:11, ECF No. 133).

19. As a consequence of the delays experience at the project and Jaynes' efforts to mitigate the delays, Armada incurred $31,251.28.00 in additional labor costs due related to cold weather protection which it would not have incurred but for the delays. (Trial Tr. Eiman 49:12–63:12, ECF No. 133).

20. As a consequence of the delays experience at the project and in accordance with the Subcontract terms, Armada was compelled to retain SDC to compile its claim for equitable adjustment. (Trial Tr. Eiman 63:14–65:24, ECF No. 133). Armada incurred $104,835.00 in costs paid to SDC to compile its claims. (*Id.*). The Court finds this cost excessive when compared to the actual costs associated with the delay. (*See* Trial Tr. Gundrum 206:11–13, ECF No. 126). The Court finds that a 20% fee applied to the costs for added concrete placements in Area A, materials and equipment used due to cold weather, cold weather and

out-of-sequence work inefficiencies, and extended field overhead costs, or $22,845.71, is reasonable and appropriate. (*Id.* 206:11–22).

21. As a consequence of the delays experienced at the project for which Armada was not at fault, Armada's duration at the project increased 188 days. (Trial Tr. Eiman 74:16–18, ECF No. 133). As a consequence of this extended duration, Armada incurred an additional $31,034.90 in field supervision costs. (*Id.* 71:5–74:15). Armada is also entitled to an additional equipment cost due to the delay during this 188-day period of $206.10 per day, or $38,746.80. (*Id.* 78:9–79:3). Armada also claims an additional field delay cost for laborers attending toolbox meetings of $2,800.07. (*Id.* 75:15–17). However, because Armada's expert failed to establish that the laborers were required to attend these meetings or that the meetings even occurred, Armada is not entitled to these additional costs. (*See id.* 77:2–22).

22. In accordance with the express terms of the Subcontract, Armada is entitled to 10% overhead and 5% profit on all additional cost and expenses incurred as a consequence of the delay and disruption it suffered from Jaynes' actions or inactions. (*See* Exs. 304.5; 510.34); (Trial Tr. Eiman 66:9–18, 81:5–17, ECF No. 133; Trial Tr. Gundrum 207:16–18, ECF No. 126). Specifically, Armada is entitled to these amounts applied to the costs for added concrete placements in Area A, materials and equipment used due to cold weather, and cold weather and out-of-sequence work inefficiencies, amounting to $1,318.86 of overhead and $2,222.34 of profit. (*See* Trial Tr. Eiman 66:9–18, 81:5–17, ECF No. 133; Trial Tr. Gundrum 210:16–23, ECF No. 126).

23. As a consequence of the delays suffered at the project for which Armada was not at fault, Armada incurred additional bonding costs of $2,788.85. (Trial Tr. Eiman 81:20–82:18, EF No. 133); (*see also* Trial Tr. 210:24–211:4, ECF No. 126).

24. Jaynes directed Armada to perform change order work under a series of change orders. (Ex. 60.594–.645). Jaynes approved and directed such work. (*Id.*). Jaynes has withheld

the amounts due under these change orders totaling $43,842.26 since April 2013. (Trial Tr. Eiman 82:19–84.22).

25. Jaynes has withheld the unpaid balance due on the Subcontract of $37,496.09 since April 2013 to which Armada is entitled. (Trial Tr. Eiman 91:9–14, ECF No. 133).

26. Jaynes has withheld $43,421.50 in unpaid retention to which Armada is entitled. (Trial Tr. Eiman 89:12–90:7, ECF No. 133).

27. The evidence establishes the unacceptable cracks in the Area B slab-on-grade were caused by Armada by failing to timely sawcut. Further, the Area B slab-on-grade failed to comply with the contract documents and requirements, as the cracking was unacceptable to the Owner and outside industry standards.

28. The parties dispute whether the slope of the slab-on-grade in Area B exceeded slab flatness tolerances causing ponding; whether Armada was responsible for pouring the slab-on-grade to meet these tolerances; whether the trench drains were set pursuant to the Project specifications; and whether Armada was responsible for setting the trench drains. However, these disputes are irrelevant in light of the Court's finding that the slab-on-grade in Area B suffered cracking that could not be repaired to meet the Owner's intended purpose.

29. The evidence establishes that the Army Corps was justified under the Contract Documents to reject the Slab and require its removal and replacement.

30. The Corps' determination of unacceptable cracking and rejection of the proposed repairs is reasonable and anticipated in light the intended usage as an exposed slab for a fire station truck bay used for housing, maintaining, and cleaning fire trucks.

31. Pursuant to the Subcontract, Armada owed Jaynes a duty of good faith and fair dealing. (*See generally* Ex. 510).

32. Armada breached the duty of good faith and fair dealing owed to Jaynes by failing to perform pursuant to the Subcontract and Contract Documents, failing to install a

compliant and acceptable slab-on-grade in Area B, and failing to remove and replace the deficient slab in Area B. Jaynes' justified expectations in a quality slab-on-grade in Area B were denied by Armada.

33. Jaynes failed to properly disclose its damages calculation pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(iii), and the failure was not justified or harmless. (Trial Tr. 73:25–74:3, ECF No. 126). Accordingly, Jaynes is not entitled to damages. *See* Fed. R. Civ. P. 37(c)(1); (Trial Tr. 77:22–78:4, 96:8–97:15, ECF No. 126). However, Jaynes did disclose its claimed damages associated with removal and replacement of the Area B slab-on-grade in its expert's rebuttal report, and Armada does not oppose their admission. (Trial Tr. 120:5–18, ECF No. 126). The Court therefore considers the merits of these damages. (*See id.*).

34. Jaynes is entitled to $287,999.17 in damages as the cost incurred to remove and replace Armada's deficient Slab. (*See* Trial Tr. Gundrum 214:19–23, ECF No. 126).

35. Pursuant to § 8.2.10 of the Subcontract, "[t]he Contractor may reject a Subcontractor payment application in whole or in part or withhold amounts from a previously approved Subcontractor payment application, as may reasonably be necessary to protect the Contractor from loss or damage and without incurring an obligation for late payment interest based upon . . . rejected, nonconforming or defective Subcontract Work which has not been corrected in a timely fashion." (Ex. 510.18).

36. Because Jaynes properly withheld payments based on Armada's failure to remove and replace the defective slab-on-grade in Area B, Armada is not entitled to interest on the outstanding late payments. (*See id.*).

37. Because the Court finds both parties at fault, it denies both parties' requests for attorneys' fees and costs.

### III. <u>CONCLUSION</u>

THEREFORE, in light of the foregoing Findings of Fact and Conclusions of Law,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that judgment is entered against Jaynes and in favor of Armada on Armada's claims for recovery on the bond, breach of contract, and breach of the implied covenant of good faith and fair dealing pursuant to the foregoing.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that judgment is entered against Armada and in favor of Jaynes on Jaynes' counterclaim for recovery on the bond, breach of contract, and breach of the implied covenant of good faith and fair dealing pursuant to the foregoing.

**IT IS FURTHER ORDERED** that Jaynes' Motion in Limine, (ECF No. 113), is **DENIED**.

**IT IS FURTER ORDERED** that Plaintiff's Motion to Strike Jaynes' Motion in Limine, (ECF No. 120), is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this __17__ day of August, 2017.

_____
Gloria M. Navarro, Chief Judge
United States District Court